Mw

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-16-154

STATE OF MAINE,                    )
                                   )
        Plaintiff                  )
                                   )
v.                                 )        AMENDED JUDGMENT AND
                                   )        ORDER
DANIEL B. TUCCI, SR., BEATRIX T.   )
TUCCI, and MARCH 31, LLC,          )
                                   )
        Defendants.                )

STATE OF MAINE
Cumberland ss Clerk's Office
JUL 02 2018
RECEIVED
12:54 pm

Following this Court's original June 13, 2018 Judgment and Order, Defendants filed a motion for amended/additional findings, amended/additional conclusions of law, and amended judgment, which the Court granted in part. Subsection II(D) of this Amended Judgment and Order contains the Court's amended and additional conclusions of law.

Before the Court is Plaintiff State of Maine's ("State") complaint for fraudulent transfer against Defendants Daniel B. Tucci, Sr. ("Tucci"), Beatrix T. Tucci ("Beatrix"), and March 31, LLC. A bench trial was held on February 12 and 13, 2018. For the following reasons, the Court will enter judgment for the State and grant relief as outlined below.

## I.    Findings of Fact

The Court makes the following fact findings based on the record of this case, including evidence received at the bench trial. On January 23, 2009, Defendant Tucci inherited from his father a ¼ interest in the property located at 104 Monument Street, Portland, Maine, valued at approximately $81,000. Tucci and his family have been longtime residents of the property. On February 24, 2009, Tucci transferred his interest to himself and his wife, Beatrix, as joint tenants. The release deed was recorded in the Cumberland County Registry of Deeds at Book 26666, Page 277. While Tucci claims he made this transfer to provide for his family in the event anything

1 of 13

**State–Thomas Knowlton, AAG**
**Defendants–David Turesky, Esq.**

happened to him, he also acknowledged at trial that "A lot of things can happen. You get sued by the Attorney General's office, or you get sued by Ms. Mitchell, or whatever." (Tr. II:88.) There was no consideration for this transfer.

On September 23, 2009, Tucci formed March 31, LLC. Beatrix and the Tuccis' three children were named members of the LLC; Tucci is not a member. On November 24, 2009, Tucci and Beatrix conveyed their joint ¼ interest in 104 Monument Street to March 31, LLC. The release deed was recorded in the Cumberland County Registry of Deeds at Book 27424, Page 68. There was no consideration for this transfer. The Tucci family continues to live at this property.

On his 2009 tax return, Tucci claimed he paid $6,000 in "rent" and paid no real estate property taxes. Tucci again claimed to have paid $6,000 in "rent" in 2010 and paid no property taxes.

For many years, Tucci has secreted a substantial amount of cash in his bedroom ceiling, some of which was saved over his many years of living with his parents, some of which was the result of a worker's compensation lawsuit, and some of which was the result of a personal injury lawsuit. At trial, Tucci testified that as of January 2010, he had roughly $65,000 stashed in this location. However, it appears Tucci actually kept as much as $90,000 there. Throughout this litigation, this money has been referred to as Tucci's "nest egg." Despite this substantial nest egg, because he failed to disclose the existence of this money to the Maine Department of Health & Human Services ("DHHS"), Tucci received MaineCare from 2003 until at least 2012. Following a stroke in 2010, Tucci began to receive Social Security Disability Income ("SSDI"). Tucci also began receiving TANF benefits in late 2010, after falsely claiming he had no income or liquid assets.

Beginning no later than 2000, Tucci was engaged in business as a sole proprietor doing various handyman and home repair projects. Tucci has been the target of numerous customer complaints. For example, in 2008, Tucci was convicted of Class B theft after charging $10,000 to a customer's credit card without her permission. In March 2009, another customer obtained a $750 judgment against Tucci for damage done to her home. The customer had to take Tucci to disclosure court in order to execute the judgment. Another customer obtained a $3,500 judgment against Tucci in 2009; she was also forced to take Tucci to disclosure court and eventually settled for $1,800. This is only a small sampling of the customers who have been harmed by Tucci within the last decade.

Around 2011, after receiving a number of consumer complaints, the Consumer Protection Division of the Attorney General's Office, led by AAGs Linda Conti and Carolyn Silsby, began investigating Tucci. In November 2011, AAG Conti issued to Tucci a civil investigative demand ("CID") for documents and testimony. Tucci produced no documents in response to the CID, and during his testimony, Tucci said he was receiving food stamps and SSDI and needed help from his church. He never disclosed the existence of March 31, LLC or his nest egg.

At a subsequent meeting between Tucci and the AAGs, Tucci produced a copy of a bank statement showing he had $14.06 in a joint account with his wife. Based on Tucci's representations, the AAGs believed him to be judgment-proof but continued to pursue a permanent injunction barring him from conducting business. In February 2012, the State filed a complaint against Tucci alleging he had violated the Unfair Trade Practices Act (UTPA). Throughout discovery, Tucci never disclosed the existence of March 31, LLC. He disclosed the existence of three bank accounts and claimed each contained a balance of $25 or less. At the UTPA trial, one consumer testified that in 2011, Tucci testified in disclosure court to having no assets and no

money. Another consumer testified that Tucci had invited a lawsuit, saying, "I got nothing and you will not get anything."

By judgment dated April 9, 2013, the Superior Court permanently enjoined Tucci from operating a home repair or handyman business. He was ordered to pay $236,500.50 in restitution for the benefit of the consumers he had harmed. He was also ordered to pay $140,000 in civil penalties, which were to be suspended as long as Tucci paid $250 per month toward the restitution. To date, Tucci has made no payments toward the judgment.

Following trial, AAG Conti requested that Tucci fill out a financial disclosure form. Tucci never completed the form. Until March 29, 2016, based on the various representations Tucci made to the AAGs, his tax returns, and testimony of consumers at the UTPA trial, AAGs Conti and Silsby believed Tucci had no significant assets and was a tenant in an apartment at 104 Monument Street. Believing a disclosure proceeding would be futile, the AAGs chose not to disclose Tucci.

On March 29, 2016, the AG's office received a tip from the adult child of one of Tucci's victims that Tucci may have an ownership interest in 104 Monument Street and that the property was listed for sale for $2.5 million. At that point, AAG Conti asked that a title search be done and discovered for the first time the transfers of 104 Monument Street from Tucci to himself and his wife and then to March 31, LLC.

The State served Defendants with a summons and complaint for fraudulent transfer on April 8, 2016. The State thereafter filed the complaint and returns of service with this Court on April 19, 2016. During the litigation of this case, the State subpoenaed records from four different financial institutions where Tucci had accounts and learned that he had misrepresented the amounts in some of his bank accounts during the UTPA litigation. The State submitted expert evidence that Tucci's ¼ interest in 104 Monument Street was worth $81,000 in 2009.

II.    Conclusions of Law

*A. Applicable law*

This case was brought pursuant to the Uniform Fraudulent Transfer Act, 14 M.R.S.A. § 3571 *et seq.* Following partial summary judgment against the State, the only remaining claim is raised under Section 3575(1)(A), which states: "A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ..., if the debtor made the transfer ... [w]ith actual intent to hinder, delay or defraud any creditor of the debtor...." Section 3575(2) contains a number of non-exclusive factors that may be considered in determining actual intent. These factors are whether:

> A. The transfer or obligation was to an insider;
> B. The debtor retained possession or control of the property transferred after the transfer;
> C. The transfer or obligation was disclosed or concealed;
> D. Before the transfer was made or obligation was incurred, the debtor sued or [was] threatened with suit;
> E. The transfer was of substantially all the debtor's assets;
> F. The debtor absconded;
> G. The debtor removed or concealed assets;
> H. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> I. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> J. The transfer occurred shortly before or shortly after a substantial debt was incurred; and
> K. The debtor transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor.

*Id.* § 3575(2); *see Morin v. Dubois*, 1998 ME 160, ¶ 5, 713 A.2d 956. The State must prove intent by clear and convincing evidence. *Morin*, 1998 ME 160, ¶ 3, 713 A.2d 956. The State is a creditor within the meaning of 14 M.R.S.A. § 3572(4), and Tucci is a debtor within the meaning of 14 M.R.S.A. § 3572(6).

The UFTA contains a statute of limitations which provides that a cause of action under Section 3575(A)(1) is extinguished unless it is brought "within 6 years after the transfer was made ... or, if later, within one year after the transfer ... was or could reasonably have been discovered by the claimant...." *Id.* § 3580(1).

*B. Statute of limitations*

Before proceeding to the merits of the State's claim, the Court must first determine whether the statute of limitations in 14 M.R.S.A. § 3580(1) is applicable to the State, and if so, whether Tucci may successfully assert the statute of limitations as an affirmative defense.

**1. Applicability of statute of limitations.** The parties dispute the applicability of the statute of limitations to the State in this case. The State typically is not bound by a statute unless it is expressly named in the statute. *Dep't of Corrs. v. Pub. Utils. Comm'n*, 2009 ME 40, ¶¶ 11-12, 968 A.2d 1047; *Jenness v. Nickerson*, 637 A.2d 1152, 1158 (Me. 1994). The UFTA defines a "creditor" as "a person who has a claim." 14 M.R.S.A. § 3572(4). The act in turn defines "person" to include "government or governmental subdivision or agency." *Id.* § 3572(9). However, the statute of limitations in Section 3580(1) does not use the term "creditor." Instead, it states that the cause of action is extinguished if not brought "within one year after the transfer ... was or could reasonably have been discovered by the *claimant*." "Claimant" is not defined in the act. Because the government is not specifically named or referenced in Section 3580(1), it is not entirely clear that the Legislature intended the UFTA's statute of limitations to apply to the State.

**2. Equitable estoppel.** The Court finds that even if the statute of limitations does apply to the State, Tucci is equitably estopped from asserting it as an affirmative defense in this case. *See* 14 M.R.S.A. § 3581 ("Unless displaced by the provisions of this Act, the principles of law and equity, including ... estoppel ..., supplement its provisions."). "Estoppel prevents a defendant

from asserting the statute of limitations when the defendant has acted to induce the plaintiff to reasonably refrain from commencing timely legal action that the plaintiff otherwise would have taken." *Vacuum Sys., Inc. v. Bridge Constr. Co.*, 632 A.2d 442, 444 (Me. 1993). Equitable estoppel requires the State to show by a preponderance of the evidence that (1) Tucci's statements or conduct induced the State to act or fail to act; (2) the State relied on Tucci's statements or conduct to its detriment; and (3) the State's reliance was reasonable. *See Auburn v. Desgrosseilliers*, 578 A.2d 712, 714 (Me. 1990); *Townsend v. Appel*, 446 A.2d 1132, 1134 (Me. 1982).

Tucci's arguments against application of equitable estoppel focus largely on the fact that he never made misrepresentations to the State regarding the transfer of his property; indeed, the State never asked about any property transfers, and Tucci never volunteered the information. However, it is inescapable fact that Tucci misrepresented his overall financial condition to the State on multiple occasions, and those misrepresentations led the State to conclude that Tucci was judgment-proof. Tucci intended to – and in fact did – mislead the State into believing he had no money and no assets. As simple as it would have been for the State to conduct an online search of the Cumberland County Registry of Deeds, Tucci led the State to believe that such a search would be fruitless, as he had created the impression that he did not own real estate. Tucci, by his misrepresentations to the State regarding his financial condition throughout the UTPA investigation, induced the State to fail to institute a disclosure proceeding or otherwise investigate Tucci's assets.

Furthermore, the State relied on Tucci's misrepresentations to its detriment. Because the State did not investigate Tucci's assets until 2016 – seven years after the transfers were made and three years after the UTPA judgment was entered – the State was put at risk of losing its fraudulent transfer claim due to the statute of limitations that Tucci now argues as an affirmative defense. The

State did not learn of the transfers of Tucci's property during the UTPA proceedings because Tucci intentionally and successfully misled the State into believing he had no assets of any significant value. The State affirms that had the State learned in 2013 of the transfers, it would have filed this action at that time. The State filed this lawsuit less than two weeks after learning of the transfers in 2016.

The final element of equitable estoppel requires a determination of whether the State's reliance on Tucci's misrepresentations was reasonable. On this point, Tucci's argument is well-taken that his behavior leading up to and during the litigation of the UTPA case should have put the State on notice that he was not trustworthy and that any information received from Tucci should be independently verified. However, the State based its belief not only on what Tucci told the AAGs during the UTPA proceeding, but also on the fact that Tucci invited at least one customer to sue him by claiming he had no assets, and representations Tucci made to the disclosure court in 2011 wherein Tucci claimed to have no money and no assets. The State also looked to apparent documentary evidence of Tucci's financial conditions such as bank statements showing only a few dollars in his bank accounts and tax returns indicating he was paying "rent" and not paying property taxes. Furthermore, the fact that Tucci was receiving MaineCare and TANF benefits indicated to the AAGs that the State in other contexts had been satisfied that Tucci had no money or assets. On multiple fronts, Tucci persistently crafted the illusion that he was judgment-proof. The Court concludes it was reasonable for the State to rely on Tucci's misrepresentations of his financial condition when it chose not to further investigate his assets.

Tucci cannot benefit from his successful ruse to mislead the State into believing he was judgment-proof. "One who has induced another to believe what is untrue may not later assert the truth." *Auburn*, 578 A.2d 712, 714 (Me. 1990). Having found the State has established each of the

elements of equitable estoppel, the Court concludes Tucci is equitably estopped from asserting his statute of limitations defense. As such, the Court will consider the merits of the State's claim.

*C. Fraudulent transfer*

Looking to the considerations outlined in 14 M.R.S.A. § 3575(2), it is clear that a number of these circumstances are present in this case. Tucci retained possession or control of the property transferred after the transfer, given that he and his family have continued to live in the apartment. *Id.* § 3575(2)(B). Before the transfer was made, Tucci repeatedly was sued or threatened with suit by dissatisfied customers. *Id.* § 3575(2)(D). In order to further create the impression of insolvency, Tucci concealed his nest egg by stashing it in his bedroom ceiling; even Beatrix claimed at trial that she did not know of its existence. *Id.* § 3575(2)(G). As the property was transferred entirely without consideration, the value of the consideration received was not equivalent to the property transferred. *Id.* § 3575(2)(H).

Furthermore, there is little room for dispute that March 31, LLC, as a company comprised entirely of Tucci's family members, was an "insider" to whom the property was transferred. *Id.* § 3575(2)(A). Although Tucci retained his nest egg, the transfer of his home was of substantially all of Tucci's known assets, and Tucci was functionally insolvent after the transfer was made because the concealed nest egg could not be reached by creditors. *Id.* § 3575(2)(E), (I).

Tucci's purported reason for the transfer is that he wanted to make provision for his family in case some misfortune befell him. This reason is doubtful as a valid excuse to absolve Tucci of liability for fraudulent transfer, as our Law Court has noted "if one transfers assets while insolvent in order to provide for one's family, it is no less a fraudulent transfer." *Morin*, 1998 ME 160, ¶ 7, 713 A.2d 956. Furthermore, as the State argues, even if this reason were sufficient to make the transfer valid, that goal was accomplished when Tucci transferred the property to himself and

Beatrix as joint tenants; it still does not explain the transfer to March 31, LLC. Given that Tucci was experiencing a number of customer complaints in 2008 and 2009, it is apparent that he was attempting to keep his assets out of reach of potential creditors.[1] The State has shown clearly and convincingly that Tucci transferred his property with actual intent to hinder, delay, or defraud creditors.

*D. Remedies*

In determining appropriate remedies, the Court rejects Defendants' contention that the State must elect a single remedy under 14 M.R.S.A. § 3578. Although Defendants make no specific argument or cite any authority supporting their position, the Court presumes this theory arises from the presence of the word "or" at the end of subsection 3578(1)(B). While this use of the word "or" could indeed counsel in favor of finding that a plaintiff must elect a single remedy, the Court has located no authority mandating this interpretation of the statute. Our rules of construction of laws provide that "[t]he words 'and' and 'or' are convertible as the sense of a statute may require." 1 M.R.S.A. § 71(2); *see also* Office of the Revisor of Statutes, *Maine Legislative Drafting Manual*, pt. III, ch. 2, §11 (A) at 110-11 (1st ed. Oct. 1990, rev. Oct. 2016) ("'And' is conjunctive. If the legislative intent is that *all* requirements be fulfilled, the drafter should use 'and.' 'Or' is disjunctive. If the fulfillment of any one of several requirements is sufficient, use 'or.'") (emphasis added). Further, the statute's provision of "[a]ny other relief the circumstances may require" seems to grant the courts broad authority to fashion a remedy that suits the needs of the case. *See* 14 M.R.S.A. § 3578(1)(C)(4).

---

[1] Arguably, because Tucci appeared to be insolvent after transferring his property, his apparent insolvent status emboldened him to continue defrauding consumers to even greater extents, as evidenced by the larger projects he took on in 2011 and 2012 and for which he was ordered to pay extensive restitution in the 2013 UTPA judgment.

Given the Law Court's holding in *Samsara Mem'l Trust* that attorney's fees are available as damages under section 3578(1)(C)(3), this Court finds no reason to limit the State's remedy to avoidance as provided by section 3578(1)(A), thereby denying attorney's fees available under section 3578(1)(C)(3). *See Samsara Mem'l Trust v. Kelly, Remmel & Zimmerman*, 2014 ME 107, ¶¶ 48-50, 102 A.3d 757. The Law Court's reasoning for awarding attorney's fees in *Samsara Mem'l Trust* is equally applicable to a plaintiff seeking avoidance of a fraudulent transfer as to a plaintiff seeking money damages. This Court also maintains that, in addition to avoidance of the transfer, an injunction preventing Defendants from further disposing of the property as provided by section 3578(1)(C)(1) is necessary in light of the fact that this property was at one point listed for sale.

No remedy is granted under section 3579. Section 3579(2) "provides that a defrauded creditor can recover a monetary judgment against the transferee of the fraudulently conveyed property in lieu of avoiding the transfer." 14 M.R.S.A. § 3579, Maine Comment 2. Because the Court awards avoidance of the transfer, an additional award of money damages against any transferee (*i.e.*, Beatrix Tucci or March 31, LLC) would be improper.

Finally, Defendants argue that any judgment awarded to the State should be limited in value to $39,792. Section 3578 provides that avoidance of the transfer is available "to the extent necessary to satisfy the creditor's claim." 14 M.R.S.A. § 3578(1)(A). The State's underlying claim is the amount of the 2013 UTPA judgment. That judgment ordered Tucci to pay $236,500.50 in restitution and $140,000.00 in civil penalties. Because the value of Tucci's interest in 104 Monument Street at the time of transfer ($81,000.00) is less than the amount of the State's underlying claim against Tucci, avoidance of the entire transfer is proper.

Defendants' argument is that the value of the judgment should be reduced because the transfer was not made with intent to defraud the Ashley and Flaherty families, who were granted a total of $196,708.50 in restitution in the UTPA judgment. Even if this allegation is accepted as fact, the Court finds it is irrelevant. Following the reasoning of the U.S. District Court for the District of Massachusetts, the UFTA permits creditors to seek avoidance of a transfer that was made with the intent to defraud, regardless of "whether the creditor's claim arose before or after the transfer was made" so long as the transfer was made to "defraud *any* creditor." *Id.* § 3575(1)(A); *Norwood Coop. Bank v. Gibbs*, No. 10-11647-JCB, 2012 U.S. Dist. LEXIS 131404, at *22-23 (D. Mass. Sept. 13, 2012) (emphasis added). Because this Court finds the transfer of 104 Monument Street was made with intent to defraud a number of Tucci's creditors (even if not the Ashleys and the Flahertys specifically), the State may rely on that fact in order to avoid the transfer in full.[2] *Norwood Coop. Bank*, 2012 U.S. Dist. LEXIS 131404, at *23.

Pursuant to 14 M.R.S.A. § 3578(1), the Court will void the 2009 transfers and enjoin Defendants from further transferring the property. Because the State has obtained a judgment against Tucci, the State may file a lien on the property that was the subject of the 2009 transfers pursuant to 14 M.R.S.A. § 3578(2). As requested by the State, Defendants will also be ordered to pay the State's attorney's fees pursuant to 14 M.R.S.A. § 3578(1)(C)(3). *See Samsara Mem'l Trust*, 2014 ME 107, ¶¶ 48-50. The State is also entitled to recover its costs from Defendants. 14 M.R.S.A. § 1501. Pursuant to 14 M.R.S.A. § 3578(1)(C)(3), attorney's fees and costs must be capped at twice the value of the transferred property.

III.    Conclusion

---

[2] This is so because if Tucci had not fraudulently transferred his property in 2009, the full value of the property would have been available in 2013 to satisfy the UTPA judgment (albeit only partially), including the amount apportioned to the Ashleys and the Flahertys. The identities of the creditors whom the transfer was intended to defraud are irrelevant.

For the foregoing reasons, judgment is entered for the State of Maine. The Court hereby voids the November 24, 2009 transfer and the February 24, 2009 transfer of Tucci's ¼ interest in 104 Monument Street. The Court enjoins Daniel B. Tucci, Sr., Beatrix T. Tucci, and March 31, LLC, as well as their heirs and assigns, from further transferring the property that was the subject of the 2009 transfers. It is further ordered that the State may file a lien on the subject property. Defendants are ordered to pay the State's reasonable attorney's fees and costs up to a maximum of twice the value of the transferred property.

The Clerk is directed to incorporate this Judgment and Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: _____7/3/18_____

_____
Lance E. Walker, Justice
Maine Superior Court

Entered on the Docket: 7/2/18

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-16-154

*Cum- Lw- 7-2-2018*

STATE OF MAINE,               )
                              )
        Plaintiff             )
                              )
   v.                         )        ORDER
                              )
DANIEL B. TUCCI, SR., BEATRIX T.  )
TUCCI, and MARCH 31, LLC,     )
                              )
        Defendants.           )

STATE OF MAINE
Cumberland ss Clerk's Office
JUL 02 2018  12:54 PM
RECEIVED

Following this Court's June 13, 2018 Judgment and Order, Defendants filed this motion for amended/additional findings, amended/additional conclusions of law, and amended judgment. Plaintiff State of Maine has filed an opposition to this motion.

I.      Background

On February 12 and 13, 2018, this Court presided over a bench trial in this matter. Thereafter the parties submitted extensive proposed findings of facts and conclusions of law. Following consideration of the evidence introduced at trial and the parties' proposed findings, this Court entered a Judgement and Order in the State's favor on June 13, 2018. Defendants timely filed this motion on June 19, 2018.

II.     Standard of Review

Pursuant to M.R. Civ. P. 52(b), the "court may. . . amend its findings or make additional findings and may amend the judgment if appropriate." However, the court need not grant every request. *In re Jacob B.*, 2008 ME 168, ¶ 15, 959 A.2d 734. A motion made under M.R. Civ. P. 52(b) "must include the proposed findings of fact and conclusions of law requested." A motion

**State-Thomas Knowlton, AAG**
**Defendants-David Turesky, Esq.**

under M.R. Civ. P. 59(e)[1] need not be granted "unless it is reasonably clear that prejudicial error has been committed or that substantial justice has not been done." *Cates v. Farrington*, 423 A.2d 539, 541 (Me. 1980). "[W]hen the trial is before a judge without a jury, such motions must be based on a manifest error of law or mistake of fact. The burden of showing harmful error rests on the [moving] party." *Id.*

III.    Discussion

A Rule 52(b) motion "should not be used to attempt to require the court to explain its reasoning in reaching a particular result or to reargue points that were contested at trial and have been resolved by the court's decision." *Wandishin v. Wandishin*, 2009 ME 73, ¶ 19, 976 A.2d 949. With this motion, Defendants are primarily attempting to reargue issues that have already been decided by the Court. Many of Defendants' proposed findings of fact submitted after trial, which are again proposed within this motion, were found to be irrelevant to the Court's decision or unsupported by the evidence. Similarly, Defendants request this Court to issue conclusions of law that the Court has already considered and rejected.

Defendants do raise one issue that merits clarification: remedies. Defendants' motion concludes: "If this Court still determines that judgment should be entered for the Plaintiff, that judgment must be limited to no more than $39,792 and can be satisfied by only one of the methods/remedies delineated at § 3578 and § 3579 of Title 14." (Defs.' Mot. 3.) The State concedes that clarification would be appropriate in order to acknowledge that under 14 M.R.S.A. § 3579, "the amount of damages and attorneys' fees recoverable <u>from a transferee</u> is generally limited to the value of the property transferred or the amount necessary to satisfy the State's claim, whichever

---

[1] Although Defendants state this motion is brought pursuant to M.R. Civ. P. 52(b), a motion to amend judgment is traditionally brought pursuant to M.R. Civ. P. 59(e), and the Court will analyze the motion for amended judgment as if brought pursuant to that rule.

is less." (Pl.'s Opp'n 10.) Defendants in turn seek an amended or additional finding that no monetary damages should be assessed against Beatrix Tucci as a transferee. (Defs.' Reply 1.) After considering the parties' arguments, the Court will clarify its conclusions of law as to remedies as follows.

At the outset, the Court rejects Defendants' contention that the State must elect a single remedy under 14 M.R.S.A. § 3578. Although Defendants make no specific argument or cite any authority supporting their position, the Court presumes this theory arises from the presence of the word "or" at the end of subsection 3578(1)(B). While this use of the word "or" could indeed counsel in favor of finding that a plaintiff must elect a single remedy, the Court has located no authority mandating this interpretation of the statute. Our rules of construction of laws provide that "[t]he words 'and' and 'or' are convertible as the sense of a statute may require." 1 M.R.S.A. § 71(2); *see also* Office of the Revisor of Statutes, *Maine Legislative Drafting Manual*, pt. III, ch. 2, §11 (A) at 110-11 (1st ed. Oct. 1990, rev. Oct. 2016) ("'And' is conjunctive. If the legislative intent is that *all* requirements be fulfilled, the drafter should use 'and.' 'Or' is disjunctive. If the fulfillment of any one of several requirements is sufficient, use 'or.'") (emphasis added). Further, the statute's provision of "[a]ny other relief the circumstances may require" seems to grant the courts broad authority to fashion a remedy that suits the needs of the case. *See* 14 M.R.S.A. § 3578(1)(C)(4).

Given the Law Court's holding in *Samsara Mem'l Trust* that attorney's fees are available as damages under section 3578(1)(C)(3), this Court finds no reason to limit the State's remedy to avoidance as provided by section 3578(1)(A), thereby denying attorney's fees available under section 3578(1)(C)(3). *See Samsara Mem'l Trust v. Kelly, Remmel & Zimmerman*, 2014 ME 107, ¶¶ 48-50, 102 A.3d 757. The Law Court's reasoning for awarding attorney's fees in *Samsara*

*Mem'l Trust* is equally applicable to a plaintiff seeking avoidance of a fraudulent transfer as to a plaintiff seeking money damages. This Court also maintains that, in addition to avoidance of the transfer, an injunction preventing Defendants from further disposing of the property as provided by section 3578(1)(C)(1) is necessary in light of the fact that this property was at one point listed for sale.

Although the Court's June 13 Judgment makes no mention of any remedy granted under section 3579, because both parties have raised the issue in their post-judgment filings, the Court will expressly clarify that no remedy is granted under section 3579. Section 3579(2) "provides that a defrauded creditor can recover a monetary judgment against the transferee of the fraudulently conveyed property in lieu of avoiding the transfer." 14 M.R.S.A. § 3579, Maine Comment 2. Because the Court has awarded avoidance of the transfer, an additional award of money damages against any transferee (*i.e.*, Beatrix Tucci or March 31, LLC) would be improper.

Finally, Defendants argue that any judgment awarded to the State should be limited in value to $39,792. Section 3578 provides that avoidance of the transfer is available "to the extent necessary to satisfy the creditor's claim." 14 M.R.S.A. § 3578(1)(A). The State's underlying claim is the amount of the 2013 UTPA judgment. That judgment ordered Tucci to pay $236,500.50 in restitution and $140,000.00 in civil penalties. Because the value of Tucci's interest in 104 Monument Street at the time of transfer ($81,000.00) is less than the amount of the State's underlying claim against Tucci, avoidance of the entire transfer is proper.

Defendants' argument, also raised in their proposed findings of fact and conclusions of law, is that the value of the judgment should be reduced because the transfer was not made with intent to defraud the Ashley and Flaherty families, who were granted a total of $196,708.50 in restitution in the UTPA judgment. Even if this allegation is accepted as fact, the Court finds it is

irrelevant. Following the reasoning of the U.S. District Court for the District of Massachusetts, the UFTA permits creditors to seek avoidance of a transfer that was made with the intent to defraud, regardless of "whether the creditor's claim arose before or after the transfer was made" so long as the transfer was made to "defraud *any* creditor." *Id.* § 3575(1)(A); *Norwood Coop. Bank v. Gibbs*, No. 10-11647-JCB, 2012 U.S. Dist. LEXIS 131404, at \*22-23 (D. Mass. Sept. 13, 2012) (emphasis added). Because this Court finds the transfer of 104 Monument Street was made with intent to defraud a number of Tucci's creditors (even if not the Ashleys and the Flahertys specifically), the State may rely on that fact in order to avoid the transfer in full.[2] *Norwood Coop. Bank*, 2012 U.S. Dist. LEXIS 131404, at \*23.

Although the Court's decision on this motion makes no substantive changes to the June 13 Judgment, clarifying language will be inserted into the Amended Judgment issued herewith as amended and additional conclusions of law, in accordance with the above analysis.

IV.    Conclusion

For the foregoing reasons, Defendants' Rule 52(b) motion is GRANTED in part and DENIED in part. An Amended Judgment will be issued to reflect the Court's amended and additional conclusions of law. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated:    **7/2/18**

Lance E. Walker, Justice
Maine Superior Court

**Entered on the Docket:** 7/2/18

---

[2] This is so because if Tucci had not fraudulently transferred his property in 2009, the full value of the property would have been available in 2013 to satisfy the UTPA judgment (albeit only partially), including the amount apportioned to the Ashleys and the Flahertys. The identities of the creditors whom the transfer was intended to defraud are irrelevant.

STATE OF MAINE
CUMBERLAND, ss.

STATE OF MAINE, )
)
Plaintiff )
)
v. )
)
DANIEL B. TUCCI, SR., BEATRIX T. )
TUCCI, and MARCH 31, LLC, )
)
Defendants. )

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-16-154

JUDGMENT AND ORDER

STATE OF MAINE
Cumberland ss Clerk's Office

2:29PM JUN 13 2018

RECEIVED

Before the Court is Plaintiff State of Maine's ("State") complaint for fraudulent transfer against Defendants Daniel B. Tucci, Sr. ("Tucci"), Beatrix T. Tucci ("Beatrix"), and March 31, LLC. A bench trial was held on February 12 and 13, 2018. For the following reasons, the Court will enter judgment for the State and grant relief as outlined below.

I.    Findings of Fact

The Court makes the following fact findings based on the record of this case, including evidence received at the bench trial. On January 23, 2009, Defendant Tucci inherited from his father a ¼ interest in the property located at 104 Monument Street, Portland, Maine, valued at approximately $81,000. Tucci and his family have been longtime residents of the property. On February 24, 2009, Tucci transferred his interest to himself and his wife, Beatrix, as joint tenants. The release deed was recorded in the Cumberland County Registry of Deeds at Book 26666, Page 277. While Tucci claims he made this transfer to provide for his family in the event anything happened to him, he also acknowledged at trial that "A lot of things can happen. You get sued by the Attorney General's office, or you get sued by Ms. Mitchell, or whatever." (Tr. II:88.) There was no consideration for this transfer.

State-Thomas Knowlton, AAG
Defendants-David Turesky, Esq.

1 of 10

On September 23, 2009, Tucci formed March 31, LLC. Beatrix and the Tuccis' three children were named members of the LLC; Tucci is not a member. On November 24, 2009, Tucci and Beatrix conveyed their joint ¼ interest in 104 Monument Street to March 31, LLC. The release deed was recorded in the Cumberland County Registry of Deeds at Book 27424, Page 68. There was no consideration for this transfer. The Tucci family continues to live at this property.

On his 2009 tax return, Tucci claimed he paid $6,000 in "rent" and paid no real estate property taxes. Tucci again claimed to have paid $6,000 in "rent" in 2010 and paid no property taxes.

For many years, Tucci has secreted a substantial amount of cash in his bedroom ceiling, some of which was saved over his many years of living with his parents, some of which was the result of a worker's compensation lawsuit, and some of which was the result of a personal injury lawsuit. At trial, Tucci testified that as of January 2010, he had roughly $65,000 stashed in this location. However, it appears Tucci actually kept as much as $90,000 there. Throughout this litigation, this money has been referred to as Tucci's "nest egg." Despite this substantial nest egg, because he failed to disclose the existence of this money to the Maine Department of Health & Human Services ("DHHS"), Tucci received MaineCare from 2003 until at least 2012. Following a stroke in 2010, Tucci began to receive Social Security Disability Income ("SSDI"). Tucci also began receiving TANF benefits in late 2010, after falsely claiming he had no income or liquid assets.

Beginning no later than 2000, Tucci was engaged in business as a sole proprietor doing various handyman and home repair projects. Tucci has been the target of numerous customer complaints. For example, in 2008, Tucci was convicted of Class B theft after charging $10,000 to a customer's credit card without her permission. In March 2009, another customer obtained a $750

judgment against Tucci for damage done to her home. The customer had to take Tucci to disclosure court in order to execute the judgment. Another customer obtained a $3,500 judgment against Tucci in 2009; she was also forced to take Tucci to disclosure court and eventually settled for $1,800. This is only a small sampling of the customers who have been harmed by Tucci within the last decade.

Around 2011, after receiving a number of consumer complaints, the Consumer Protection Division of the Attorney General's Office, led by AAGs Linda Conti and Carolyn Silsby, began investigating Tucci. In November 2011, AAG Conti issued to Tucci a civil investigative demand ("CID") for documents and testimony. Tucci produced no documents in response to the CID, and during his testimony, Tucci said he was receiving food stamps and SSDI and needed help from his church. He never disclosed the existence of March 31, LLC or his nest egg.

At a subsequent meeting between Tucci and the AAGs, Tucci produced a copy of a bank statement showing he had $14.06 in a joint account with his wife. Based on Tucci's representations, the AAGs believed him to be judgment-proof but continued to pursue a permanent injunction barring him from conducting business. In February 2012, the State filed a complaint against Tucci alleging he had violated the Unfair Trade Practices Act (UTPA). Throughout discovery, Tucci never disclosed the existence of March 31, LLC. He disclosed the existence of three bank accounts and claimed each contained a balance of $25 or less. At the UTPA trial, one consumer testified that in 2011, Tucci testified in disclosure court to having no assets and no money. Another consumer testified that Tucci had invited a lawsuit, saying, "I got nothing and you will not get anything."

By judgment dated April 9, 2013, the Superior Court permanently enjoined Tucci from operating a home repair or handyman business. He was ordered to pay $236,500.50 in restitution

for the benefit of the consumers he had harmed. He was also ordered to pay $140,000 in civil penalties, which were to be suspended as long as Tucci paid $250 per month toward the restitution. To date, Tucci has made no payments toward the judgment.

Following trial, AAG Conti requested that Tucci fill out a financial disclosure form. Tucci never completed the form. Until March 29, 2016, based on the various representations Tucci made to the AAGs, his tax returns, and testimony of consumers at the UTPA trial, AAGs Conti and Silsby believed Tucci had no significant assets and was a tenant in an apartment at 104 Monument Street. Believing a disclosure proceeding would be futile, the AAGs chose not to disclose Tucci.

On March 29, 2016, the AG's office received a tip from the adult child of one of Tucci's victims that Tucci may have an ownership interest in 104 Monument Street and that the property was listed for sale for $2.5 million. At that point, AAG Conti asked that a title search be done and discovered for the first time the transfers of 104 Monument Street from Tucci to himself and his wife and then to March 31, LLC.

The State served Defendants with a summons and complaint for fraudulent transfer on April 8, 2016. The State thereafter filed the complaint and returns of service with this Court on April 19, 2016. During the litigation of this case, the State subpoenaed records from four different financial institutions where Tucci had accounts and learned that he had misrepresented the amounts in some of his bank accounts during the UTPA litigation. The State submitted expert evidence that Tucci's ¼ interest in 104 Monument Street was worth $81,000 in 2009.

II.  Conclusions of Law

*A. Applicable law*

This case was brought pursuant to the Uniform Fraudulent Transfer Act, 14 M.R.S.A. § 3571 *et seq.* Following partial summary judgment against the State, the only remaining claim is

raised under Section 3575(1)(A), which states: "A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ..., if the debtor made the transfer ... [w]ith actual intent to hinder, delay or defraud any creditor of the debtor...." Section 3575(2) contains a number of non-exclusive factors that may be considered in determining actual intent. These factors are whether:

A. The transfer or obligation was to an insider;
B. The debtor retained possession or control of the property transferred after the transfer;
C. The transfer or obligation was disclosed or concealed;
D. Before the transfer was made or obligation was incurred, the debtor sued or [was] threatened with suit;
E. The transfer was of substantially all the debtor's assets;
F. The debtor absconded;
G. The debtor removed or concealed assets;
H. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
I. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
J. The transfer occurred shortly before or shortly after a substantial debt was incurred; and
K. The debtor transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor.

*Id.* § 3575(2); *see Morin v. Dubois*, 1998 ME 160, ¶ 5, 713 A.2d 956. The State must prove intent by clear and convincing evidence. *Morin*, 1998 ME 160, ¶ 3, 713 A.2d 956. The State is a creditor within the meaning of 14 M.R.S.A. § 3572(4), and Tucci is a debtor within the meaning of 14 M.R.S.A. § 3572(6).

The UFTA contains a statute of limitations which provides that a cause of action under Section 3575(A)(1) is extinguished unless it is brought "within 6 years after the transfer was made ... or, if later, within one year after the transfer ... was or could reasonably have been discovered by the claimant...." *Id.* § 3580(1).

*B. Statute of limitations*

Before proceeding to the merits of the State's claim, the Court must first determine whether the statute of limitations in 14 M.R.S.A. § 3580(1) is applicable to the State, and if so, whether Tucci may successfully assert the statute of limitations as an affirmative defense.

**1. Applicability of statute of limitations.** The parties dispute the applicability of the statute of limitations to the State in this case. The State typically is not bound by a statute unless it is expressly named in the statute. *Dep't of Corrs. v. Pub. Utils. Comm'n*, 2009 ME 40, ¶¶ 11-12, 968 A.2d 1047; *Jenness v. Nickerson*, 637 A.2d 1152, 1158 (Me. 1994). The UFTA defines a "creditor" as "a person who has a claim." 14 M.R.S.A. § 3572(4). The act in turn defines "person" to include "government or governmental subdivision or agency." *Id.* § 3572(9). However, the statute of limitations in Section 3580(1) does not use the term "creditor." Instead, it states that the cause of action is extinguished if not brought "within one year after the transfer ... was or could reasonably have been discovered by the *claimant*." "Claimant" is not defined in the act. Because the government is not specifically named or referenced in Section 3580(1), it is not entirely clear that the Legislature intended the UFTA's statute of limitations to apply to the State.

**2. Equitable estoppel.** The Court finds that even if the statute of limitations does apply to the State, Tucci is equitably estopped from asserting it as an affirmative defense in this case. *See* 14 M.R.S.A. § 3581 ("Unless displaced by the provisions of this Act, the principles of law and equity, including ... estoppel ..., supplement its provisions."). "Estoppel prevents a defendant from asserting the statute of limitations when the defendant has acted to induce the plaintiff to reasonably refrain from commencing timely legal action that the plaintiff otherwise would have taken." *Vacuum Sys., Inc. v. Bridge Constr. Co.*, 632 A.2d 442, 444 (Me. 1993). Equitable estoppel requires the State to show by a preponderance of the evidence that (1) Tucci's statements or conduct induced the State to act or fail to act; (2) the State relied on Tucci's statements or conduct

to its detriment; and (3) the State's reliance was reasonable. *See Auburn v. Desgrosseilliers*, 578 A.2d 712, 714 (Me. 1990); *Townsend v. Appel*, 446 A.2d 1132, 1134 (Me. 1982).

Tucci's arguments against application of equitable estoppel focus largely on the fact that he never made misrepresentations to the State regarding the transfer of his property; indeed, the State never asked about any property transfers, and Tucci never volunteered the information. However, it is inescapable fact that Tucci misrepresented his overall financial condition to the State on multiple occasions, and those misrepresentations led the State to conclude that Tucci was judgment-proof. Tucci intended to – and in fact did – mislead the State into believing he had no money and no assets. As simple as it would have been for the State to conduct an online search of the Cumberland County Registry of Deeds, Tucci led the State to believe that such a search would be fruitless, as he had created the impression that he did not own real estate. Tucci, by his misrepresentations to the State regarding his financial condition throughout the UTPA investigation, induced the State to fail to institute a disclosure proceeding or otherwise investigate Tucci's assets.

Furthermore, the State relied on Tucci's misrepresentations to its detriment. Because the State did not investigate Tucci's assets until 2016 – seven years after the transfers were made and three years after the UTPA judgment was entered – the State was put at risk of losing its fraudulent transfer claim due to the statute of limitations that Tucci now argues as an affirmative defense. The State did not learn of the transfers of Tucci's property during the UTPA proceedings because Tucci intentionally and successfully misled the State into believing he had no assets of any significant value. The State affirms that had the State learned in 2013 of the transfers, it would have filed this action at that time. The State filed this lawsuit less than two weeks after learning of the transfers in 2016.

The final element of equitable estoppel requires a determination of whether the State's reliance on Tucci's misrepresentations was reasonable. On this point, Tucci's argument is well-taken that his behavior leading up to and during the litigation of the UTPA case should have put the State on notice that he was not trustworthy and that any information received from Tucci should be independently verified. However, the State based its belief not only on what Tucci told the AAGs during the UTPA proceeding, but also on the fact that Tucci invited at least one customer to sue him by claiming he had no assets, and representations Tucci made to the disclosure court in 2011 wherein Tucci claimed to have no money and no assets. The State also looked to apparent documentary evidence of Tucci's financial conditions such as bank statements showing only a few dollars in his bank accounts and tax returns indicating he was paying "rent" and not paying property taxes. Furthermore, the fact that Tucci was receiving MaineCare and TANF benefits indicated to the AAGs that the State in other contexts had been satisfied that Tucci had no money or assets. On multiple fronts, Tucci persistently crafted the illusion that he was judgment-proof. The Court concludes it was reasonable for the State to rely on Tucci's misrepresentations of his financial condition when it chose not to further investigate his assets.

Tucci cannot benefit from his successful ruse to mislead the State into believing he was judgment-proof. "One who has induced another to believe what is untrue may not later assert the truth." *Auburn*, 578 A.2d 712, 714 (Me. 1990). Having found the State has established each of the elements of equitable estoppel, the Court concludes Tucci is equitably estopped from asserting his statute of limitations defense. As such, the Court will consider the merits of the State's claim.

*C. Fraudulent transfer*

Looking to the considerations outlined in 14 M.R.S.A. § 3575(2), it is clear that a number of these circumstances are present in this case. Tucci retained possession or control of the property

transferred after the transfer, given that he and his family have continued to live in the apartment. *Id.* § 3575(2)(B). Before the transfer was made, Tucci repeatedly was sued or threatened with suit by dissatisfied customers. *Id.* § 3575(2)(D). In order to further create the impression of insolvency, Tucci concealed his nest egg by stashing it in his bedroom ceiling; even Beatrix claimed at trial that she did not know of its existence. *Id.* § 3575(2)(G). As the property was transferred entirely without consideration, the value of the consideration received was not equivalent to the property transferred. *Id.* § 3575(2)(H).

Furthermore, there is little room for dispute that March 31, LLC, as a company comprised entirely of Tucci's family members, was an "insider" to whom the property was transferred. *Id.* § 3575(2)(A). Although Tucci retained his nest egg, the transfer of his home was of substantially all of Tucci's known assets, and Tucci was functionally insolvent after the transfer was made because the concealed nest egg could not be reached by creditors. *Id.* § 3575(2)(E), (I).

Tucci's purported reason for the transfer is that he wanted to make provision for his family in case some misfortune befell him. This reason is doubtful as a valid excuse to absolve Tucci of liability for fraudulent transfer, as our Law Court has noted "if one transfers assets while insolvent in order to provide for one's family, it is no less a fraudulent transfer." *Morin*, 1998 ME 160, ¶ 7, 713 A.2d 956. Furthermore, as the State argues, even if this reason were sufficient to make the transfer valid, that goal was accomplished when Tucci transferred the property to himself and Beatrix as joint tenants; it still does not explain the transfer to March 31, LLC. Given that Tucci was experiencing a number of customer complaints in 2008 and 2009, it is apparent that he was attempting to keep his assets out of reach of potential creditors.[1]

---

[1] Arguably, because Tucci appeared to be insolvent after transferring his property, his apparent insolvent status emboldened him to continue defrauding consumers to even greater extents, as evidenced by the larger projects he took on in 2011 and 2012 and for which he was ordered to pay extensive restitution in the 2013 UTPA judgment.

The State has shown clearly and convincingly that Tucci transferred his property with actual intent to hinder, delay, or defraud creditors. Pursuant to 14 M.R.S.A. § 3578, the Court will void the 2009 transfers and enjoin Defendants from further transferring the property. Because the State has obtained a judgment against Tucci, the State may file a lien on the property that was the subject of the 2009 transfers pursuant to 14 M.R.S.A. § 3578(2). As requested by the State, Defendants will also be ordered to pay the State's attorney's fees pursuant to 14 M.R.S.A. § 3578(1)(C)(3). *See Samsara Mem'l Trust v. Kelly, Remmel & Zimmerman*, 2014 ME 107, ¶¶ 48-50. The State is also entitled to recover its costs from Defendants. 14 M.R.S.A. § 1501. Pursuant to 14 M.R.S.A. § 3578(1)(C)(3), attorney's fees and costs must be capped at twice the value of the transferred property.

III.    Conclusion

For the foregoing reasons, judgment is entered for the State of Maine. The Court hereby voids the November 24, 2009 transfer and the February 24, 2009 transfer of Tucci's ¼ interest in 104 Monument Street. The Court enjoins Daniel B. Tucci, Sr., Beatrix T. Tucci, and March 31, LLC, as well as their heirs and assigns, from further transferring the property that was the subject of the 2009 transfers. It is further ordered that the State may file a lien on the subject property. Defendants are ordered to pay the State's reasonable attorney's fees and costs up to a maximum of twice the value of the transferred property.

The Clerk is directed to incorporate this Judgment and Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated:    6/13/18

Lance E. Walker, Justice
Maine Superior Court

Entered on the Docket: 6/13/18
mc

10 of 10

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET No. CV-16-154

STATE OF MAINE, )
)
Plaintiff )
)
v. )
)
DANIEL B. TUCCI, SR. )
BEATRIX T. TUCCI, and )
MARCH 31, LLC, )
)
Defendants )
)

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

STATE OF MAINE
Cumberland. ss Clerk's Office

AUG 02 2017
3:44 p.m.
RECEIVED

Before the Court is Defendants' Motion for Summary Judgment

I.    Background

As alleged in the Complaint, between 2004 and 2012, Defendant Daniel B. Tucci, Sr. ("Tucci, Sr.") was engaged in the business of home repair and maintenance services. Tucci, Sr. pled guilty to a Class D theft charge in connection with his home repair business on November 18, 2008. On January 22, 2009, Tucci, Sr. inherited two parcels of real estate, along with the buildings thereon, located at 104 Monument Street in Portland, Maine, (the "Property") as a tenant in common with his three brothers, by deed recorded in the Cumberland County Registry of Deeds at Book 26625, Page 69. The Property contains a multi-unit building with at least three apartments in which Tucci, Sr., two of his brothers, and their families live.

On February 24, 2009, Tucci, Sr. transferred his interest in the Property to himself and his wife, Defendant Beatrix Tucci, as joint tenants, by deed recorded in the Cumberland County Registry of Deeds in Book 26666, Page 277. Defendant MARCH 31, LLC, was formed on September 24, 2009 and on November 24, 2009, Tucci, Sr. and

1

**Plaintiff-Thomas Knowlton, AAG
Defendants-David Turesky, Esq.**

Beatrix Tucci transferred their interest in the Property to MARCH 31, LLC by deed recorded in the Cumberland County Registry of Deeds in Book 27424, Page 68. Beatrix Tucci was the sole manager of MARCH 31, LLC in 2010. In 2011, and from 2013 to present, MARCH 31, LLC was, and continues to be managed by Beatrix Tucci, Pauline S. Tucci, Daniel B. Tucci, Jr., and Francis Everett Nash Tucci, all of whom reside at the Property with Tucci, Sr., Pauline, Daniel, Jr., and Francis are the children of Tucci, Sr. and Beatrix Tucci. As of December 20, 2011, Pauline was 16, Daniel was 6, and Francis was 3 years old.

In 2012, the State brought suit against Tucci, Sr. and TPDF, LLC, through which Tucci, Sr. operated his home repair business, for violations of the Maine Unfair Practices Act (the "UTPA"). The State alleges that Tucci, Sr. falsely advertised that he was licensed; threatened and intimidated consumers; took advance payments for services that he did not perform; performed home repair services in an unworkmanlike manner; and refused to correct such work or to pay refunds. After a bench trial, the Court issued Judgment against Tucci, Sr. and TPDF, LLC for multiple violations of the UTPA and ordered them, jointly and severally, to pay $236,500.50 in restitution to the Office of the Attorney General for the benefit of fourteen consumers on whose behalf the suit was brought. The Court also ordered Tucci, Sr. and TPDF to pay, jointly and severally, $140,000 in civil penalties to the state of Maine which were fully suspended on the condition that he pay a minimum of $250 per month toward the restitution amount for a period of ten years to the Office of the Attorney General.

Neither Tucci, Sr. nor TPDF has ever paid anything towards the court ordered restitution or civil penalties. In deposition for the prior action, Tucci, Sr. claimed not to

2

have any assets, to be collecting food stamps and Social Security Disability and assistance from the "Church". The Attorney General learned that the Property was listed for sale for $2.5 million in 2016 by an anonymous tip.

This action for fraudulent transfer pursuant to 14 M.R.S. § 3575 was brought by the State on April 19, 2016. On March 3, 2017, the Court signed the agreed upon order dismissing claims brought for fraudulent transfer with actual intent to hinder, delay or defraud. The State amended its complaint to reflect that only those claims for fraudulent transfer without receiving a reasonably equivalent value in exchange remain. Defendants now move the Court for Summary Judgment on these claims.

II.     Standard of Review

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. "A material fact is one that can affect the outcome of the case. A genuine issue of material fact exists when the fact finder must choose between competing versions of the truth." *Id.* (citations omitted). When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.*

When the party moving for summary judgment bears the burden on a claim or defense, the moving party must establish the existence of each element of the claim or defense without dispute as to any material fact in the record in order to obtain summary judgment. *Cach, LLC v. Kulas*, 2011 ME 70, ¶ 8, 21 A.3d 1015. If the motion for summary judgment is properly supported, then the burden shifts to the non-moving party

3

to respond with specific facts indicating a genuine issue for trial in order to avoid summary judgment. M.R. Civ. P. 56(e).

## III. Discussion

### A. 14 M.R.S. § 3580

Defendants move the Court to grant summary judgment on the State's claim for fraudulent transfer pursuant to 14 M.R.S. § 3575(4) for failing to meet the statute of limitations as set out in 14 M.RS. § 3580. According to 14 M.R.S. § 3580:

> A cause of action with respect to a fraudulent transfer or obligation under this Act is extinguished unless action is brought:
>     1. Intent to defraud. Under section 3575, subsection 1, paragraph A, within 6 years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;

14 M.R.S. § 3580. According to the statute, the cause of action for fraudulent transfer is extinguished if it is not brought within six years of the transfer or when the obligation is incurred, or if the injured party reasonably does not learn of the transfer until after the six-year period and fails to file a complaint within one year of discovery. *See Id.*

### B. Argument

Defendants argue that the transfers occurred in 2009, outside of the six-year statute of limitations permitted by Section 3580. Defendant argues that the State was obligated to perform a record search as soon as a judgment was entered against Tucci, Sr., and possibly sooner. Defendants further argue that even if the State was not obligated to search the registries of deeds in Maine, it should have known from the nature of the judgment against Defendant and the AG's previous experience with Tucci, Sr., of his "general unreliability and untrustworthiness." (D. Mot. for Summ. J. at 6).

4

The State responds, arguing not only that the Court should deny Defendant's Motion for Summary Judgment, but also that the Court should grant summary judgment in favor of the State on the issue of whether Section 3580(1) applies to the State in accordance with M.R. Civ. P. 56(c). The State presents three main arguments to support its requested relief: the statute of limitations is not applicable to the State, the State did not discover the transfers until April 5, 2016, and unclean hands.

Looking first to the State's contention that the statute of limitations is not applicable to the State, the State argues that it is not bound to a statute of limitation "unless expressly named therein". *Dep't of Corr. v. PUC*, 2009 ME 40, ¶ 11, 968 A.2d 1047. By that reasoning, the State argues that Section 3580 does not bind the State.

In the alternative, if the Court finds that Section 3580 does apply to the State, the State argues that Defendants have not shown that it was unreasonable that the State did not discover the transfers until April 5, 2016. The burden falls upon Defendants to prove the affirmative defense that the action is barred by the statute of limitations. *Drilling & Blasting Rock Specialists, Inc. v. Rheaume*, 2016 ME 131, ¶ 15, 147 A.3d 824. The State argues that there are questions of genuine material fact as to whether the State's late discovery of the transfers was reasonable, and therefore whether the statute of limitations was tolled. Because there are genuine questions of material fact, the State contends that summary judgment should be denied.

Finally, the State argues that the Court should apply the doctrine of unclean hands, thereby preventing Defendants' enforcement of the statute of limitations. The doctrine of unclean hands stands for the proposition that "whenever a party who as actor seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience or

5

good faith, or other equitable principle in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right or to award him any remedy." *Hamm v. Hamm*, 584 A.2d 59, 61 (Me. 1990); citing 1 Pomeroy, *Equity Jurisprudence* § 397 (3d ed. 1905) (emphasis removed). The State argues that Defendants, having purposefully sought to mislead the State, cannot be granted relief upon the basis that the attempts to mislead were successful.

C. Analysis

As the State argues, there remains a question of fact concerning whether the State's discovery of the 2009 transfers in 2016 was reasonable. The question of when late discovery is reasonable was discussed in *Drilling & Blasting Rock Specialists, Inc. v. Rheaume*. In that case, the defendant granted a warranty deed on a property to the plaintiff, stating within the deed that the property was free and clear of all encumbrances. *Drilling*, 2016 ME 131, ¶ 4, 147 A.3d 824. The defendant failed to tell the plaintiff that the property was encumbered by a mortgage. *Id.* The plaintiff did not learn that the property was encumbered until defendant ceased to make payments and the mortgagee brought a foreclosure action. *Id* at ¶ 8. The Law Court followed the well established rule that "[w]hether a claim is barred by the applicable limitations period is a question of law, but whether a plaintiff has exercised sufficient diligence to avoid a finding that it "should have discovered" the cause of action earlier for purposes of determining when the limitations period on a fraud claim commenced is 'ordinarily . . . a question of fact,'" *Id.* at ¶ 16.[1] The Court notes that a creditor's obligation to search public records necessarily

---

[1] In the same order, the Law Court stated that "when uncontroverted evidence leaves no room for a reasonable difference of opinion as to whether the plaintiff exercised due diligence and indisputably demonstrates that the plaintiff should have discovered the

6

exist only once the creditor is reasonably put on notice that fraud had occurred, and that the concept of record notice does not equate to a defense against fraud sounding in tort. *Id.* at ¶¶ 26, 28. On those grounds the Law Court found questions of material fact and vacated the grant of summary judgment.

Defendants contend that the current case does not have a direct misrepresentation, as was made by the defendant in *Drilling* when he warranted that the property was free and clear of encumbrances. Additionally, Defendants claim that *Drilling* analyzes 14 M.R.S § 859, not Section 3580. Defendants argue that the standard is not exactly the same and urges the Court to look to Oklahoma caselaw finding that recordation of an interest was sufficient to foreclose the possibility of the tolling of a statute of limitations for late discovery of that interest. See *Eskridge v. Nalls,* 852 P.2d 818, 819 (Okla. Ct. App. Apr. 6, 1993). Finally, Defendants distinguish the case at bar from *Drilling* by pointing out that the plaintiff in *Drilling* was unrepresented, whereas here the State was represented by the Office of the Attorney General.

The Court finds Defendants attempts to distinguish the current case from *Drilling* unpersuasive. As with the plaintiff in *Drilling*, the State alleges that Defendant made a misrepresentation and that the State was not reasonably on notice that fraud had occurred. Similarly to the plaintiff in *Drilling*, the State, in this matter, did not perform public record checks to ensure that fraud had not occurred. This Court finds, as did the Law Court in *Drilling*, that the facts of the case as presented at this point allow for a reasonable difference of opinion as to whether the State should have learned about the

---

fraud, the issue may be resolved at summary judgment as a matter of law." *Drilling*, 2016 ME 131, ¶ 24, 147 A.3d 824.

transfers before 2016. Because the Court finds that genuine questions of material fact remain, the Court does not reach the State's alternative arguments.

IV.     Conclusion

The Court denies Defendant's Motion for Summary Judgment.

Dated: 8/2/17

Lance Walker
Justice, Superior Court

8